**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

ANGEL LOPEZ-VALENZUELA; ISAAC
CASTRO-ARMENTA,
*Plaintiffs-Appellants*,

v.

COUNTY OF MARICOPA; JOSEPH M.
ARPAIO, Maricopa County Sheriff,
in his official capacity; WILLIAM G.
MONTGOMERY, Maricopa County
Attorney, in his official capacity,
*Defendants-Appellees*.

No. 11-16487

D.C. No.
2:08-cv-00660-
SRB

OPINION

Appeal from the United States District Court
for the District of Arizona
Susan R. Bolton, District Judge, Presiding

Argued and Submitted
October 19, 2012—San Francisco, California

Filed June 18, 2013

Before: Raymond C. Fisher, Richard C. Tallman,
and Consuelo M. Callahan, Circuit Judges.

Opinion by Judge Tallman;
Dissent by Judge Fisher

## SUMMARY[*]

### Civil Rights

The panel affirmed the district court's summary judgment and partial Fed. R. Civ. P. 12(b)(6) dismissal of a class action challenging Proposition 100, a ballot measure passed by Arizona voters that amended the state constitution to preclude bail for certain serious felony offenses if the person charged has entered or remained in the United States illegally and if the proof is evident or the presumption great as to the charge.

The panel held that the Arizona Legislature and Arizona voters passed Proposition 100 and its implementing statute and rules to further the state's legitimate and compelling interest in seeing that those accused of serious state-law crimes are brought to trial. The panel concluded that Plaintiffs-Appellants had not succeeded in raising triable issues of fact as to whether Proposition 100 and its implementing procedures violate the substantive and procedural due process guarantees of the United States Constitution's Fourteenth Amendment, the Excessive Bail Clause of the Eighth Amendment, and the Sixth Amendment right to counsel, nor whether the Proposition 100 laws are preempted by federal immigration law.

Dissenting, Judge Fisher stated that Proposition 100's legislative history and scope revealed that Arizona is plainly using the denial of bail as a method to punish "illegal" immigrants, rather than simply as a tool to help manage

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

arrestees' flight risk.  He stated that this bail-denial scheme contravenes the Constitution's fundamental prohibition on punishment before a determination of guilt in a criminal trial.

## COUNSEL

Cecillia D. Wang (argued) and Kenneth J. Sugarman, American Civil Liberties Union Foundation Immigrants' Rights Project, San Francisco, California; Andre I. Segura and Esha Bhandari, American Civil Liberties Union Foundation Immigrants' Rights Project, New York, New York; Daniel Pochoda, American Civil Liberties Foundation of Arizona, Phoenix, Arizona, for Plaintiffs-Appellants.

Timothy J. Casey (argued), Schmitt Schneck Smyth Casey & Even, P.C., Phoenix, Arizona, for Defendants-Appellees Maricopa County and Joseph M. Arpaio.

Bruce P. White and Anne C. Longo, Deputy County Attorneys, Maricopa County Civil Services Division, Phoenix, Arizona, for Defendant-Appellee William Montgomery.

## OPINION

TALLMAN, Circuit Judge:

In 2006, Arizona voters overwhelmingly approved an amendment to their state constitution known as "Proposition 100."  It commands that Arizona state courts may not set bail "[f]or serious felony offenses as prescribed by the legislature if the person charged has entered or remained in the United

States illegally and if the proof is evident or the presumption great as to the present charge." Ariz. Const. art. II, § 22(A)(4) (as amended). Felony arrestee plaintiffs Angel Lopez-Valenzuela and Isaac Castro-Armenta filed a class action in the United States District Court for Arizona seeking declaratory, injunctive, and habeas relief challenging the constitutionality of Proposition 100 and its implementing statute and rules. They argue that the new criminal procedures violate the substantive and procedural due process guarantees of the Fourteenth Amendment, the Excessive Bail Clause of the Eighth Amendment, and the Sixth Amendment right to counsel. They further claim that the Arizona law is preempted by federal immigration law. The district court granted summary judgment and partial dismissal in favor of the Arizona state officials named in the suit. We affirm.

# I

Voters approved the November 2, 2006, ballot measure by a margin of 78 percent to 22 percent. Prior to passage of Proposition 100, Article II, Section 22 set forth several exceptions to the general presumption that persons charged with crimes are entitled to bail. These exceptions were for particularly serious offenses such as murder or sexual abuse of children or other indicia of dangerousness. To ensure the defendant's presence throughout his criminal prosecution, amended Article II, Section 22 now provides that no bail may be set "[f]or serious felony offenses as prescribed by the legislature if the person charged has entered or remained in the United States illegally and if the proof is evident or the presumption great as to the present charge." Ariz. Const. art. II, § 22(A)(4). Proposition 100 does not contain a definition of "serious felony offense." To make that determination we must look to the general laws of Arizona. Prior to

Proposition 100's passage, the Arizona Legislature passed House Bill 2580, defining "serious felony offense," should Proposition 100 be adopted by the electorate, as any Class 1, 2, 3, or 4 felony or aggravated driving-under-the-influence offense.  Ariz. Rev. Stat. Ann. § 13-3961(A)(5)(b).

In the early days after Proposition 100's enactment there was confusion over the standard of proof that should apply to the determination of immigration status for bail purposes during an initial appearance ("IA").[1]  Some IA commissioners were applying a "proof evident/presumption great" standard to both the criminal charge and the immigration status determination.  To resolve the uncertainty, on April 3, 2007, the Chief Justice of the Arizona Supreme Court issued Administrative Order 2007-30.  Admin. Order No. 2007-30, *available at* http://www.azcourts.gov/portals/22/admorder/ orders07/2007-30.pdf (last visited June 10, 2013).  The Order set the standard of proof for IA immigration status determinations as probable cause.  *Id.*  But the Order also directed that if a commissioner found probable cause to believe that a defendant had entered or remained in the United States illegally, a follow-up evidentiary hearing on whether bail should be denied was to be held within twenty-four hours.  *Id.*  At that hearing, known as a

---

[1] A person arrested for a felony crime in Arizona must be taken before a judicial officer for an initial review to ascertain probable cause to justify the arrest (if made by a peace officer without an arrest warrant) and to make a preliminary determination as to whether the person will be detained or released on various conditions.  Ariz. R. Crim. P. 4.1, 4.2. The task in Maricopa County is routinely handled by court commissioners. *See Superior Court Criminal Department*, THE JUDICIAL BRANCH OF ARIZONA, MARICOPA COUNTY, http://www.superiorcourt.maricopa.gov/ SuperiorCourt/CriminalDepartment/innovation.asp#a (last visited June 10, 2013).

*Simpson*/*Segura* hearing,[2] defendants would be "entitled to representation by counsel, and to present evidence, testimony, and witnesses, by proffer or otherwise, to provide evidence on the defendant's behalf." *Id.* The standard of proof for immigration status at the *Simpson*/S*egura* hearing was to be the "proof evident/presumption great" standard. *Id.*

Before Administrative Order 2007-30 could be implemented, however, the Arizona Legislature passed Senate Bill 1265, codifying the probable cause standard for the immigration status determination. Ariz. R. Crim. P. 7.2(b). In the wake of the Bill's passage, the Chief Justice rescinded Administrative Order 2007-30 and adopted amendments to the Arizona Rules of Criminal Procedure recognizing the probable cause standard for immigration status determinations. *See Segura*, 196 P.3d at 840 (detailing the history of Proposition 100, Administrative Order 2007-30, and Senate Bill 1265). The current Rules now provide that the bail determination must be made at the initial appearance, that "any party" may move for a reexamination of release conditions imposed at the initial appearance, and that a hearing on such motion "shall be held on the record as soon as practicable but not later than seven days after filing of the motion." Ariz. R. Crim. P. 7.4(b).

Plaintiff-Appellant Angel Lopez-Valenzuela was arrested and charged with the crime of dangerous drug transportation and/or offer to sell, a Class 2 felony under Arizona criminal law. Ariz. Rev. Stat. Ann. § 13-3407(A)(7). Because the IA commissioner found probable cause to believe him to be in the United States illegally, he was denied bail pursuant to the

---

[2] *Simpson v. Owens*, 85 P.3d 478 (Ariz. Ct. App. 2004); *Segura v. Cunanan*, 196 P.3d 831 (Ariz. Ct. App. 2008).

Proposition 100 laws. Plaintiff-Appellant Isaac Castro-Armenta was arrested and charged with Class 2, 3, and 4 felonies including aggravated assault with a deadly weapon, kidnaping, and assisting a criminal syndicate. Probable cause was also found to believe that Castro-Armenta was in the United States illegally and he too was denied bail under Proposition 100.

The two arrestees then filed a combined class action complaint and habeas corpus petition seeking declaratory and injunctive relief to strike down the Proposition 100 laws and to restrain the state's bail enforcement policies and practices. The district court granted Plaintiffs' motion to certify their lawsuit as a class action pursuant to Federal Rule of Civil Procedure 23(b)(2), and by the same order granted Defendants' Rule 12(b)(6) motion to dismiss their claim that Proposition 100 was preempted by federal immigration laws. *Lopez-Valenzuela v. Maricopa County*, No. 08-00660 (D. Ariz. Dec. 9, 2008) (order certifying class and granting partial dismissal).[3] The parties filed cross-motions for summary judgment on the remaining claims and the district court entered final judgment granting Defendants' motion as to five of the remaining six counts in their Complaint. The court subsequently dismissed without prejudice (per Plaintiffs' request) the final count addressing the Fifth Amendment right against self-incrimination.[4] *Lopez-Valenzuela v. Maricopa*

---

[3] The class was defined as "[a]ll persons who have been or will be ineligible for release on bond by an Arizona state court in Maricopa County pursuant to Section 22(A)(4) of the Arizona Constitution and A.R.S. § 13-3961(A)(5)."

[4] The Fifth Amendment claim is not before us on appeal.

*County*, No. 08-00660 (D. Ariz. Mar. 19, 2011) (order granting summary judgment and dismissal).

## II

We review de novo a district court's grant or denial of summary judgment. *Russell Country Sportsmen v. U.S. Forest Serv.*, 668 F.3d 1037, 1041 (9th Cir. 2011). We also review de novo a district court's grant of a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6). *Cousins v. Lockyer*, 568 F.3d 1063, 1067 (9th Cir. 2009). We review a challenge to the constitutionality of a statute de novo as well. *United States v. Gonzales*, 307 F.3d 906, 909 (9th Cir. 2002).

## A

We must first determine whether Proposition 100 bail laws create an impermissible scheme of punishment in violation of the federal Constitution's Due Process Clause. We evaluate substantive due process challenges to bail statutes under the framework articulated in *United States v. Salerno*, 481 U.S. 739 (1987). The Supreme Court there instructed us that "[t]o determine whether a restriction on liberty constitutes impermissible punishment or permissible regulation, we first look to legislative intent." *Id.* at 747. Absent an express intent on the part of the legislature to punish, "the punitive/regulatory distinction turns on whether an alternative purpose to which the restriction may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned to it." *Id.* (internal citations and quotation marks omitted). In other words, under this two-pronged approach, even where a legislature does not express a clear punitive intent a bail

regulation may still be unconstitutional if it is excessive in relation to its legitimate alternative purpose.

The Arizona Legislature made no formal findings on the purpose of Proposition 100. Absent such findings, courts can look to the legislative record as well as to statements made in election materials circulated to the voters who approved it to determine legislative intent. *See City of Cuyahoga Falls v. Buckeye Cmty. Hope Found.*, 538 U.S. 188, 196–97 (2003). Having reviewed all of the evidence, we are convinced, as was the district court, that the record as a whole does not show that Proposition 100 was motivated by an improper punitive purpose.

It is undisputed that during committee hearings on the Proposition 100 laws, several legislators made statements about controlling illegal immigration. For example, then-Representative Russell Pearce, the sponsor of the Proposition 100 bill, speaking in a March 2005 Arizona Senate Judiciary Committee hearing, stated: "[B]ad enough you're illegal but you commit a serious crime you ought not to be bondable unless you're released after prosecution, after you do your time to ICE and then to be deported. In fact, all illegal aliens in this country ought to be detained, debriefed and deported." *Senate Judiciary Committee Meeting on H.B. 2389*, Mar. 28, 2005, 47th Leg., 1st Regular Sess. (Ariz. 2005). Senator Jack Harper, speaking at the same hearing, declared: "[W]hat part of illegal don't we understand? Illegal aliens shouldn't be able to get bond for anything let alone a Class 1, 2, or 3 felony." *Id.* However, in this March 28 committee meeting alone, Pearce mentioned flight risk and public safety as the primary reasons behind the Proposition 100 laws three different times. For example:

> The aim of the bill is to keep those folks who are a threat to our society, again there's several criteria for release on bail as you know currently. . . . This simply adds to that criteria because one of the risks, one of the factors involv[ed] in setting bond currently is flight risk. If you are not in this country legally and have no roots . . . their flight risk is a much greater risk.

*Id.*

Representative Pearce again discussed flight risk during a House Floor Meeting. *House Floor Meeting on H.B. 2580*, Mar. 7, 2006, 47th Leg., 2nd Regular Sess. (Ariz. 2006). He mentioned flight risk and public safety five times during the June 7, 2007, House Floor Meeting on the companion Senate Bill. *House Floor Meeting on S.B. 1265*, June 7, 2007, 48th Leg., 1st Regular Sess. (Ariz. 2007). Other Representatives mentioned flight risk and public safety as motiving factors three more times in the same legislative meeting. Thus, while it is clear from the record that Arizona lawmakers were concerned with the effects of illegal immigration when they were debating the Proposition 100 laws, a fair reading of the record does not support Plaintiffs-Appellants' argument that Proposition 100's primary purpose is to punish and deter immigration offenses.[5]

---

[5] The dissent suggests that Plaintiffs-Appellants need not "prove that punishment was the sole or even the predominant purpose of the legislation" in order for us to hold that it is impermissibly punitive. Dissent at 42, n.2. Not only are the cases cited for this proposition not on point, but the dissent fails to acknowledge the presumption of constitutionality which we are required to apply. *See Flemming v. Nestor*, 363 U.S. 603, 617 (1960) ("We observe initially that only the clearest

Nor do the materials provided to voters demonstrate a clear punitive purpose. The official voter information guide contained four statements in favor and one against Proposition 100. Publicity Pamphlet Issued by Janice K. Brewer, then Arizona Secretary of State, *Ballot Propositions & Judicial Performance Review, General Election, November 7, 2006*, 13–14, *available at* http://www.azsos.gov/election/ 2006/info/PubPamphlet/english/Prop100.htm. A statement by Don Goldwater, a candidate for Arizona Governor reads in part: "This Ballot Measure addresses one area that needs to be resolved in this fight to secure our borders and reduce the level of crime in our neighborhoods." *Id.* at 14. But a statement by Representative Pearce reads: "With few real ties to the community and often completely undocumented by state agencies, any illegal aliens can easily escape prosecution for law breaking simply because they are so difficult to locate." *Id.* at 13. The Maricopa County Attorney wrote: "Far too many illegal immigrants accused of serious crimes have jumped bail and slipped across the border in order to avoid justice in an Arizona courtroom." *Id.* at 13–14. The other supporting statements also invoked "flight risk." *See id.* On balance, we agree with the district court that the ballot

---

proof could suffice to establish the unconstitutionality of a statute on [the ground that it is motivated by a punitive purpose]. . . . [T]he presumption of constitutionality with which this enactment, like any other, comes to us forbids us lightly to choose that reading of the statute's setting which will invalidate it over that which will save it. It is not on slight implication and vague conjecture that the legislature is to be pronounced to have transcended its powers, and its acts to be considered as void.") (citation, alteration marks, and internal quotation marks omitted); *Alaska Packers Ass'n v. Indus. Accident Comm'n*, 294 U.S. 532, 543 (1935) (applying "the presumption of constitutionality which attaches to every state statute").

materials to which voters were exposed are, at best, arguably neutral on the question of punitive intent.

Likewise, the media coverage of Proposition 100 leading up to the November 2006 election cited in the record does not establish a punitive purpose. Although one Arizona newspaper piece described Proposition 100 as one of "a foursome of ballot measures aimed at curbing illegal immigration," Brady McCombs, *Four Propositions on Entrants Out in Front*, ARIZ. DAILY STAR, Oct. 29, 2006, at B2, another editorial stated that "An illegal immigrant is, without a doubt, a high [flight] risk because of the ability to come and go out of the country when they please." Moses Sanchez, *Research Immigration Issues Before Voting*, ARIZ. REPUBLIC, Oct. 11, 2006, at 19. And in the same video where a CNN correspondent discussed "four ballot measures that will further crack down on illegal aliens in the state," the Maricopa County Attorney said: "Well, Arizona has a tremendous problem with illegal immigrants coming into the state, committing serious crimes, and then absconding, and not facing trial for their crimes, either because they jump bail after they are let out, or because, when they are let out on bail, the federal government deports them." *Lou Dobbs Tonight* (CNN television broadcast Oct. 13, 2006). Reviewing the record, neither the legislative history nor the voter materials and media coverage would support the argument that Proposition 100 was motivated by a punitive rather than a regulatory purpose. Proposition 100 survives the first prong of the *Salerno* substantive due process test.

## B

The second prong of the *Salerno* substantive due process test asks that we examine whether Proposition 100 is

excessive in relation to its legitimate alternative purpose. 481 U.S. at 747. Proposition 100's legitimate—indeed its compelling—purpose is ensuring that defendants remain in the United States to stand trial for alleged felony violations of Arizona's criminal laws. Thus, the correct inquiry under *Salerno* is whether Proposition 100 is "reasonably related to [the] legitimate governmental objective" of controlling the flight risk of defendants accused of certain state-law felonies. *Bell v. Wolfish*, 441 U.S. 520, 539 (1979). We hold that it is.

Plaintiffs-Appellants argue that Proposition 100 is excessive in relation to its goal because it precludes any individualized determinations of flight risk and covers a broad range of offenses, including some that might result in non-custodial sentences. In essence, they argue, a Proposition 100 status determination serves as a proxy for an individualized finding of flight risk because while a defendant held nonbondable under Proposition 100 can seek an individualized *Simpson*/*Segura* hearing, the judicial officer will determine only that there is proof evident or presumption great that the defendant committed a Class 1 through 4 felony and probable cause to believe that the defendant entered or remained in the country illegally. *See Segura*, 196 P.3d at 843 (explaining that "*Simpson* identified what is necessary to fully litigate a no-bail determination"); *Simpson v. Owens*, 85 P.3d 478, 494 (Ariz. Ct. App. 2004) ("Arizona law does not require that a risk of flight or a risk of recidivism be considered before bail is denied.").[6]

---

[6] The dissent compares the denial of bail in this context to the removal by the state of an unwed father's children after the death of their mother. We think it worth noting that an irrebuttable presumption that all unwed fathers are unsuitable parents is hardly in the same category as Arizona's studied decision to withhold bail from those the government has shown by

Denial of bail without individualized consideration of flight risk or dangerousness is not unusual. After all, the vast majority of states categorically deny the right to bail to persons charged with capital crimes, and at least eight states categorically deny bail to those charged with crimes punishable by life imprisonment.[7]     Missouri has a bail

a proof evident/presumption great standard have committed Class 1 through 4 state-law felonies.

[7] *See* Ala. Const. art. I, § 16; Alaska Const. art. I, § 11; Ark. Const. art. 2, § 8; Cal. Const. art. I, § 12; Colo. Const. art. II, § 19; Conn. Const. art. I, § 8; Del. Const. art. I, § 12; Fla. Const. art. I, § 14 (categorical denial of bail to those charged "with a capital offense or an offense punishable by life imprisonment"); Idaho Const. art. I, § 6; Ill. Const. art. I, § 9 (categorical denial of bail to those charged with a capital offense or offense punishable by life imprisonment); Ind. Const. art. 1, § 17 (categorical denial of bail to those charged with "murder or treason"); Kan. Const. Bill of Rights § 9; Ky. Const. § 16; La. Const. art. I, § 18; Me. Const. art. I, § 10 (categorical denial of bail for "any of the crimes which now are, or have been denominated capital offenses since the adoption of the Constitution . . . whatever the punishment of the crimes may be"); Mass. Gen. Laws ch. 276, § 20D (categorical denial of bail to those charged with a capital offense or offense punishable by life imprisonment); Mich. Const. art. I, § 15 (categorical denial of bail for charges of murder, treason, repeat violent felonies, and felonies committed while out on bail, probation, or parole for a prior violent felony); Minn. Const. art. I, § 7; Miss. Const. art. 3, § 29; Mo. Const. art I, § 20; Neb. Const. art. I, § 9 (categorical denial of bail for murder, treason, and rape); Nev. Const. art. 1, § 7 (categorical denial of bail to those charged with a capital offense or offense punishable by life imprisonment); N.H. Rev. Stat. § 597:1-c (categorical denial of bail for any offense "punishable by up to life in prison"); N.J. Const. art. I, § 11; N.M. Const. art. II, § 13; N.D. Const. art. I, § 11; Ohio Const. art. I, § 9; Okla. Const. art. 2, § 8; Or. Const. art. I, § 14 (murder and treason); Pa. Const. art. I, § 14 (capital offenses or offenses punishable by life imprisonment); R.I. Const. art. I, § 9 (offenses punishable by life imprisonment, offenses involving dangerous weapons by defendants previously convicted of other offenses, and certain controlled substance offenses); S.C. Const. art. I, §15 (capital

provision similar to Arizona's Proposition 100 laws whereby judges are to presume that no set of bail conditions can reasonably assure a defendant's appearance if the judge reasonably believes that the defendant "is an alien unlawfully present in the United States." Mo. Rev. Stat. § 544.470(2). Defendants held without bail under Missouri's statute are given the opportunity to prove their lawful presence in the United States but if unable to do so are held without bail, irrespective of any individualized considerations of flight risk. *Id.* Arizona's Proposition 100 laws, therefore, are neither unprecedented nor unique.

Many states deny bail for those accused of a wide range of offenses (including certain drug offenses, sexual assault offenses, crimes of violence, and repeat felonies) after an individualized showing of flight risk or dangerousness,[8] yet

---

offenses, offenses punishable by life imprisonment, and certain violent offenses); Tenn. Const. art. I, § 15; Utah Const. art. I, § 8 (capital offenses, felony offenses committed while out on bail, probation, or parole for prior felony offense); Wash. Const. art. I, § 20; Wyo. Const. art. 1, § 14.

[8] California's constitution is illustrative:

> A person shall be released on bail by sufficient sureties, except for:
>
> . . . (b) Felony offenses involving acts of violence on another person, or felony sexual assault offenses on another person, when the facts are evident or the presumption great and the court finds based upon clear and convincing evidence that there is a substantial likelihood the person's release would result in great bodily harm to others."

Cal. Const. art. I, § 12.

not all states require such individualized determinations.
Notably, Arizona is one of the states that categorically denies
bail to persons charged with certain particularly serious
crimes without requiring individualized determinations of
flight risk or dangerousness. *See* Ariz. Const. art. II, § 22
("All persons charged with crime shall be bailable by
sufficient sureties, except: 1. For capital offenses, sexual
assault, sexual conduct with a minor under fifteen years of
age or molestation of a child under fifteen years of age when
the proof is evident or the presumption great."); *Simpson*,
85 P.3d at 494 ("Arizona law does not require that a risk of
flight or a risk of recidivism be considered before bail is
denied.").[9]  Thus, Proposition 100 is nothing more than an
extension of Arizona's existing pretrial detention scheme to
include defendants the state believes present a significant
flight risk, thus "narrowly focus[ing] on a particularly acute
problem in which the Government interests are
overwhelming." *Salerno*, 481 U.S. at 750.[10]

---

[9] Citing *Simpson*, the New Hampshire Supreme Court upheld a similar
categorical pretrial detention scheme in *State v. Furgal*, 13 A.3d 272
(N.H. 2010).  The court rejected the defendant's assertion that *Salerno*
requires a court to consider the specific circumstances of each defendant's
risk of flight before denying bail.  *Id.* at 279 ("Given this long history of
bail permitting courts in a narrow category of cases to focus exclusively
upon the evidence of the defendant's guilt, the individualized inquiry for
which the defendant argues cannot be said to be 'implicit in the concept
of ordered liberty.'").

[10] The dissent complains that Arizona has failed to put forward
"findings, studies, statistics or other evidence" demonstrating that illegal
immigrants pose a heightened flight risk.  Dissent at 43.  There is no
requirement that a legislature support an intuitive proposition borne out by
anecdotal evidence with statistical studies.  Otherwise, any state law or
local ordinance with an arguably punitive impact would require scientific
studies to withstand a due process challenge.  Moreover, the Supreme

The Court of Appeals of Arizona embraced this justification when it upheld Proposition 100 against a constitutional challenge in *Hernandez v. Lynch*, 167 P.3d 1264 (Ariz. Ct. App. 2007). Quoting *Salerno*, the Arizona court explained that "our electorate and Legislature 'perceived pretrial detention as a potential solution to a pressing societal problem.'" *Id.* at 1274. Addressing the argument that Proposition 100 encompasses a broad range of crimes, including those often resulting in non-custodial sentences, the court pointed out that "the types of offenses . . . are no less serious than those encompassed by the [federal detention statute upheld in *Demore*]." *Id.* at 1275.[11]

---

Court has previously acknowledged that there is support for the proposition that criminal aliens pose a greater flight risk. *See Demore v. Kim*, 538 U.S. 510, 519 (2003) (noting that the record showed that "more than 20% of deportable criminal aliens failed to appear for their removal hearings"); *cf. City of Renton v. Playtime Theaters, Inc.*, 475 U.S. 41, 51–52 (1986) (finding that city was entitled to rely on the experiences of other cities and was not required to conduct new studies or gather independent evidence when enacting a zoning ordinance challenged on First Amendment grounds).

The record in this case includes committee hearing discussions on the "numerous examples of serious and violent criminals that [the] Maricopa County Attorney's Office has prosecuted in the past that have escaped justice because they have either slipped back across the border after they've been released on bail or they've been deported by the federal government after they were released on bail . . . ." If the dissent is not satisfied by the anecdotal evidence presented in the Arizona Legislature on this subject, it is unclear why it is comfortable with the anecdotal evidence in the record of "examples of undocumented immigrants who were arrested before Proposition 100, granted bail and appeared at their court dates and trials." Dissent at 46.

[11] *Demore* upheld detention without bail of aliens subject to deportation—an administrative proceeding without the more substantial risks inherent when facing a serious felony criminal prosecution.

"Proposition 100 denies bail to illegal aliens charged with Class 1, 2, 3 and 4 felonies, the least of which is punishable by a minimum of one year in prison." *Id.*

Arizona's substantial interest in ensuring that those charged with serious state-law crimes are available to answer for them is undeniable. To strike down Proposition 100 on the grounds that it violates substantive due process would require us to find that Proposition 100 "is not reasonably related to a legitimate goal" and is "arbitrary and purposeless" such that we "may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted." *Bell*, 441 U.S. at 539. Although *Salerno* requires an individualized determination of dangerousness for nonbondability decisions under the federal Bail Reform Act of 1984, our analysis of Arizona's Proposition 100 need not parallel *Salerno*'s analysis of the federal Act. This is so because Proposition 100 seeks to target flight risk rather than dangerousness.

In pursuit of this undeniably legitimate goal, Proposition 100 reaches a larger number of crimes than the Bail Reform Act and allows for denial of bail on a showing of unlawful presence. However, simply because the decision to deny bail pursuant to Proposition 100 is arrived at differently than it would be under federal law does not mean that Proposition 100 necessarily violates substantive due process. Balancing

---

Furthermore, *Demore* upheld these detentions pursuant to 8 U.S.C. § 1226(c) without requiring individualized determinations of flight risk or dangerousness. 538 U.S. at 515–16. If the federal government can detain aliens subject to deportation for months while their administrative proceedings are pending, Arizona is within constitutional bounds if it chooses to incarcerate pre-trial those illegal aliens it has arrested on probable cause for committing serious felony offenses.

the individual's right to liberty with Arizona's compelling interest in assuring appearance at trial, "we cannot categorically state that pretrial detention 'offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.'" *Salerno*, 481 U.S. at 751 (citing *Snyder v. Massachusetts*, 291 U.S. 97, 105 (1934)).  Because Proposition 100 is reasonably related to the legitimate goal of controlling flight risk, we hold that it is not excessive in violation of substantive due process under the Constitution of the United States.

## III

"When government action depriving a person of life, liberty, or property survives substantive due process scrutiny, it must still be implemented in a fair manner. . . . This requirement has traditionally been referred to as 'procedural' due process." *Salerno*, 481 U.S. at 746 (citing *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)).  The felony arrestees assert that the Proposition 100 laws violate procedural due process by failing to provide a meaningful opportunity for accused persons to contest their status determinations. Specifically, Plaintiffs-Appellants argue that the probable cause standard applied to immigration status determinations at both the initial appearance and any subsequent *Simpson*/*Segura* hearing is constitutionally inadequate. They also challenge Defendants-Appellees' implementing policies and practices as procedurally deficient and error-prone. We believe Proposition 100 survives both of these challenges.

## A

"[A] judicial determination of probable cause is a prerequisite to any extended restraint on the liberty of an

adult accused of crime." *Schall v. Martin*, 467 U.S. 253, 274–75 (1984) (citing *Gerstein v. Pugh*, 420 U.S. 103, 114 (1975)). Plaintiffs-Appellants ask us to hold that immigration status inquiries in Proposition 100 cases are fundamentally incompatible with a probable cause standard of proof because immigration status is a technical legal question requiring application of the federal Immigration and Nationality Act rather than a probabilistic inquiry. They request the use of a heightened standard "that takes into account the complexity of the question and the exceptionally strong liberty interest at stake." Corrected Brief of Appellants at 46, No. 11-16487 (Nov. 2, 2011). The argument asks too much at the initial appearance and ignores the procedural protections should a request be made for a review hearing seven days later.

Where the United States seeks to hold a dangerous defendant without bail, the federal Bail Reform Act places the burden of proof on the government to show by clear and convincing evidence that the defendant poses a danger such that "no condition or combination of conditions will reasonably assure the safety of any other person and the community . . . ." 18 U.S.C. § 3142(f)(2). The Act is silent about the standard of proof required when the government seeks pretrial detention due to flight risk, but we have held that under the Act flight risk must only be shown by the lower "clear preponderance of the evidence" standard. *See United States v. Motamedi*, 767 F.2d 1403, 1406 (9th Cir. 1985). In practice, temporary detention is frequently ordered by federal magistrate judges at the initial appearance subject to review at a subsequent detention hearing where the parties are better prepared to litigate the issue.

The district court here found that the difference between Arizona's probable cause standard for Proposition 100 status

determinations and the federal "clear preponderance" standard for flight risk determinations does not amount to a procedural due process violation, and we agree.  States are entitled to determine the laws that govern their criminal justice systems, and the Arizona Legislature spoke clearly when it passed Senate Bill 1265 codifying the probable cause standard.    This is especially true in light of the prior confusion that had surrounded the standard of proof for Proposition 100 status determinations. Taking account of this confusion, as well as the complexity of status determinations and the strong liberty interests at stake, the Arizona Legislature nevertheless felt that the probable cause standard was constitutionally adequate.  The fact that Congress chose to set a higher standard of proof for dangerousness determinations under federal bail law does not render any less legitimate Arizona's choice regarding the standard of proof that best achieves its goal of preventing flight before trial. Arizona's probable cause standard for Proposition 100 status determinations does not violate the United States Constitution.

**B**

In *Simpson v. Owens*, the Court of Appeals of Arizona established that due process requires an accused "be provided a [bail] hearing, . . . during which he [or she] must be given an opportunity to be heard at a meaningful time and in a meaningful manner," 85 P.3d at 487 (internal citations and quotation marks omitted).  Drawing from the procedures outlined in *Salerno*, the *Simpson* court explained that in an Arizona bail hearing the accused is entitled to counsel, has the right to examine and cross-examine witnesses, to review in advance witnesses' prior written statements, and that the

court must make a determination on the record.  *Id.* at 492–93.

Plaintiffs-Appellants nevertheless claim that procedures employed both at initial appearances and bail hearings in Arizona violate procedural due process guarantees and lead to incorrect status determinations.  Specifically, they note that in Maricopa County sheriff's deputies question arrestees, check various databases including federal immigration databases, and then list on Post-It notes the docket numbers of those they deem nonbondable, delivering those notes to the prosecution and the court who generally give the notes conclusive effect at initial appearances. Proposition 100 defendants are not permitted to see the evidence the deputies submit in support of a finding of nonbondability under Proposition 100, either at the initial appearance or at the *Simpson*/*Segura* hearing (if one is requested), and arrestees are not informed during the initial appearance of their right to an evidentiary hearing on bondability.

The concern with the procedures employed by sheriff's deputies at initial appearances is best addressed by looking to the remedial procedures already in place in Arizona via *Simpson*/*Segura* hearings.  The Court of Appeals of Arizona struck a balance between the state's interest in detaining certain arrestees and the arrestees' fundamental liberty interests when it declared that "[i]nitial appearances serve the limited function of providing some check on the ability of the state to hold a defendant, but they continue to be ill-suited to support conclusive findings affecting a defendant's liberty." *Segura*, 196 P.3d at 841.  *Simpson*/*Segura* hearings are available in Arizona precisely because

> [i]t would be a rare occasion when an adequate bail hearing could be conducted at the initial appearance for a [Proposition 100] offense. . . . [I]t is not feasible for the bail hearing to take place at the time of the initial hearing if for no other reason than that the accused must be given adequate notice to prepare for the hearing.

*Simpson*, 85 P.3d at 495. Thus, any deficiencies in the probable cause determination made at an initial appearance—due to deputies' Post-It notes or otherwise—can be cured at a *Simpson*/*Segura* hearing. Indeed, that is exactly what such hearings are for.

Plaintiffs-Appellants contend that Proposition 100 defendants are not permitted to see the evidence submitted in support of a finding of nonbondability under Proposition 100. A review of the record reveals that Maricopa County's Section 287(g)-certified deputies[12] must refuse to provide documents to defendants or their attorneys regarding immigration status because those documents are federal immigration documents and under federal law are not discoverable until immigration proceedings are commenced

---

[12] The Section 287(g) program allows state and local law enforcement entities to enter into partnerships with U.S. Immigration and Customs Enforcement ("ICE") in order to receive delegated authority to assist in immigration enforcement within their respective jurisdictions. Under the program, local officers are trained to enforce immigration law as authorized through Section 287(g) of the Immigration and Nationality Act. *See Fact Sheet: Delegation of Immigration Authority Section 287(g) Immigration and Nationality Act*, U.S. Department of Homeland Security, http://www.ice.gov/news/library/factsheets/287g.htm (last visited June 10, 2013).

against the alien by the U.S. Department of Homeland Security.  There is no indication from the record that the sheriff deliberately withholds information from Proposition 100 defendants or otherwise deprives them of a fair opportunity to litigate their status determinations at *Simpson*/*Segura* hearings; therefore, we hold that procedural due process guarantees are not violated.

Plaintiffs-Appellants also claim that arrestees are not informed during the initial appearance of their right to an evidentiary hearing on bondability.  That may well be true. It does not appear that the IA commissioners regularly inform the arrestees of their right to such hearings.  Although translations are provided at the hearings, some arrestees do not speak English.  Many are unrepresented at their initial appearances, and if indigent they may not meet with appointed counsel for some time after their Proposition 100 status determinations.  During this period they will be detained pursuant to Proposition 100 while they wait to meet with their appointed attorneys, and may not know that they can request a *Simpson*/*Segura* hearing to challenge their status determinations until they speak with their lawyers.

Nevertheless, whether or not they are immediately aware of it, Arizona Rule of Criminal Procedure 7.4(b) provides detainees a right to request a prompt bond hearing, and the hearing must take place within seven days of the request. Arizona's Rules of Criminal Procedure give criminal trials priority over civil trials, so even a detainee who fails to request a *Simpson*/*Segura* hearing is entitled to be tried within 150 days of arraignment. *Hernandez*, 167 P.3d at 1275.  The Supreme Court in *Demore* approved detention of illegal aliens for periods longer than that.  538 U.S. at 529–31.  In light of Arizona's legitimate and compelling interest in

controlling flight risk, the pretrial detention of arrestees who, it bears repeating, the government must demonstrate by a proof evident/presumption great standard committed Class 1 through 4 state-law felonies, does not violate procedural due process simply because arrestees are not informed at their initial appearances of the existence of Rule 7.4(b).[13]  While Arizona's initial appearance procedures may not be ideal, they are not fundamentally unfair so as to violate the Constitution.

## IV

We turn next to Plaintiffs-Appellants' argument that Proposition 100's categorical bail prohibition is arbitrary and unreasonable in violation of the Eighth Amendment.  The Excessive Bail Clause of the Eighth Amendment provides that, "[e]xcessive bail shall not be required,"  U.S. Const. amend. VIII, cl. 1, but as the Supreme Court observed in *Salerno*, "[t]his Clause, of course, says nothing about whether bail shall be available at all."  481 U.S. at 752.  "The Eighth Amendment has not prevented Congress from defining the classes of cases in which bail shall be allowed in this country."  *Carlson v. Landon*, 342 U.S. 524, 545 (1952). To determine whether a particular legislative denial of bail violates the Excessive Bail Clause, we "look to the valid state interests bail is intended to serve for a particular individual and judge whether bail conditions are excessive for the

---

[13] We note that this issue could be resolved if the commissioners would inform the arrestees of their right to a *Simpson/Segura* hearing at the initial appearance.  Although perhaps advisable, we nonetheless conclude that the failure of the commissioners to do so as a standard practice does not amount to a due process violation.  Once counsel appear to represent arrestees, these lawyers will presumably know and request a hearing when they believe it appropriate to do so.

purpose of achieving those interests." *Galen v. Cnty. of L.A.*, 477 F.3d 652, 660 (9th Cir. 2007). Because we have determined that Proposition 100 is not excessive in relation to Arizona's interest in ensuring that illegal alien criminal defendants appear for trial, it follows that Proposition 100 does not violate the Excessive Bail Clause.

Plaintiffs-Appellants point to pre-*Salerno* authority as support for their position that Proposition 100 categorically denies bail arbitrarily and unreasonably. *Hunt v. Roth*, 648 F.2d 1148, 1162 (8th Cir. 1981), *vacated as moot sub nom. Murphy v. Hunt*, 455 U.S. 478, 481 (1982), held that the Nebraska constitution's categorical denial of bail to those charged with certain sex offenses violated the Eighth Amendment because it did not allow for individualized determinations of suitability for pretrial release. But *Hunt*, just as *Salerno*, dealt with a case in which the government's interest was "protecting society from [persons accused of offenses]," *id.* at 1163, and "[t]he state [did] not contend that an absolute denial of bail to all persons charged with forcible rape is rationally related or necessary to assuring their appearance at trial." *Id.* at 1162. Thus, unlike Proposition 100, the Nebraska law was focused on dangerousness rather than flight risk. Plaintiffs-Appellants point to no cases holding that a legislature's decision to categorically deny bail in the interest of assuring presence at trial is arbitrary or unreasonable in violation of the Eighth Amendment. Because Proposition 100 bail conditions are not excessive in light of Arizona's legitimate interests and bail is not denied arbitrarily or unreasonably, the Proposition 100 laws do not violate the Eighth Amendment Excessive Bail Clause.

## V

Plaintiffs-Appellants contend that Proposition 100 has complicated initial appearances in Arizona to such a degree that they have become an adversarial and critical stage of proceedings triggering the Sixth Amendment right to counsel. The Maricopa County Attorney's Office staffs IA proceedings, although prosecutors are only called in to the IA courtroom if needed. Maricopa County sheriff's deputies occasionally testify at IAs to address questions from the court regarding an arrestee's Proposition 100 status. After the passage of Proposition 100, the indigent defense agency in Maricopa County began sending attorneys to IAs, but the practice was halted after Maricopa County decided not to fund county-paid counsel for that purpose

Initial appearances in Arizona must take place within 24 hours of an arrest. Ariz. R. Crim. P. 4.1(a). The proceedings are brief and no plea is entered. During the proceedings the IA commissioner must: ascertain the defendant's name and address; inform the defendant of the charges, the right to counsel, and the right to remain silent; determine whether probable cause exists to believe that a crime was committed (if the arrest was made without a warrant); appoint counsel if the defendant is eligible; and determine release conditions, including a Proposition 100 status determination if appropriate. Ariz. R. Crim. P. 4.2(a).

Both we and the Supreme Court of Arizona have held that there is no constitutional right to an attorney at initial appearances. *See United States v. Perez*, 776 F.2d 797, 800 (9th Cir. 1985), *overruled on other grounds by United States v. Cabaccang*, 332 F.3d 622, 634–35 (9th Cir. 2003) (en banc); *State v. Cook*, 724 P.2d 556, 561 (Ariz. 1986).

Plaintiffs-Appellants argue that in light of the immigration status determinations that now may take place at IAs, these pre-Proposition 100 precedents no longer apply.

We employ a three-factor test to determine whether an event constitutes a critical stage of a prosecution. If (1) "failure to pursue strategies or remedies results in a loss of significant rights," (2) "skilled counsel would be useful in helping the accused understand the legal confrontation," or (3) "the proceeding tests the merits of the accused's case," then the proceeding is a critical stage triggering the right to counsel. *United States v. Bohn*, 890 F.2d 1079, 1080–81 (9th Cir. 1989) (citing *Menefield v. Borg*, 881 F.2d 696, 698–99 (9th Cir. 1989)). Applying this test, IAs in Arizona—even those that include Proposition 100 status determinations—do not trigger the right to counsel.

Given the administrative nature of Arizona's IA proceedings, it is unlikely that a defendant unrepresented by counsel would fail to pursue a strategy or remedy during the initial appearance and thereby lose significant rights. The only strategies or remedies available to a defendant who seeks to avoid pretrial detention are to deny either the crime(s) alleged or that the defendant has entered or remained in the United States illegally. But, as no plea is entered at an IA and the "initial appearance provides no opportunity for a defendant to present evidence or make any argument regarding the law or evidence," *Segura*, 196 P.3d at 841, these are not remedies available at the initial appearance. Rather, these are remedies available after the initial appearance at a *Simpson*/*Segura* hearing, by which point counsel will have been appointed. Thus, Proposition 100 initial appearances do not run afoul of the first factor of the *Bohn* test.

Likewise, due to the administrative nature of IAs in Arizona, skilled counsel would not be useful in helping the accused understand the legal confrontation.  Record transcripts of Maricopa County IAs demonstrate that IA commissioners are doing what Rule 4.2(a) requires.  Skilled counsel is unnecessary to help an accused understand the purely administrative matters covered during an IA—in fact the appointment of counsel is one of the tasks performed at the first appearance.  "To require that counsel be appointed before the judge asks routine questions such as the defendant's name and financial ability would be self-defeating."  *Perez*, 776 F.2d at 800.  Proposition 100 procedures therefore survive the second factor of *Bohn*'s "critical stage" test.

Finally, Proposition 100 status determinations at IAs do not test the merits of the accused's case such that *Bohn*'s third factor is implicated.  No plea is entered, and any discussion of immigration status is undertaken for the sole purpose of determining whether a defendant is nonbondable under Proposition 100.  The IA transcripts cited to by Plaintiffs-Appellants support this reading.  For example, when one defendant's interpreter said that "[defendant] has spoken to his solicitor and she is getting the case ready for asylum," the commissioner responded, "You can certainly discuss that matter with your solicitor and until your asylum petition is approved . . . there is probable cause to believe that you're in the country illegally at this time. . . . [A]t this time, because of your immigration status, you're not entitled to bond . . . ."  Plaintiffs-Appellants have not put forward any evidence demonstrating that a defendant's statements about immigration status at an IA are being used in subsequent federal criminal prosecutions for illegal entry or re-entry, or in subsequent state criminal prosecutions where unlawful

immigration status is an element of the offense.  Accordingly, they have failed to show that Proposition 100 determinations at initial appearances are critical stages that trigger the Sixth Amendment right to counsel.

## VI

Proposition 100 laws are neither expressly nor impliedly preempted by federal immigration law.  While it is true that many state laws addressing immigration are preempted by federal law, the Supreme Court has said that not "every state enactment which in any way deals with aliens is a regulation of immigration and thus per se preempted" by the federal government's broad and exclusive constitutional power to regulate immigration.  *De Canas v. Bica*, 424 U.S. 354, 355 (1976).  Plaintiffs-Appellants argue that Proposition 100 is preempted because it attempts to regulate immigration, intrudes into fields exclusively occupied by federal congressional action, and conflicts with the federal Immigration and Nationality Act.  Each of these arguments is unavailing.

## A

It is "[a] fundamental principle of the Constitution . . . that Congress has the power to preempt state law."  *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000).  And it is beyond doubt that "[t]he authority to control immigration—to admit or exclude aliens—is vested solely in the Federal government."  *Takahashi v. Fish & Game Comm'n*, 334 U.S. 410, 416 (1948) (citing *Fong Yue Ting v. United States*, 149 U.S. 698, 713 (1893)); *see* U.S. CONST. art. I, § 8, cl. 4 (Congress has authority to "establish an uniform Rule of Naturalization").  Were the Proposition 100

laws actual regulations of immigration—that is, were they to actually function as a determination of who should or should not be admitted or allowed to remain in the United States—they would be preempted. *See De Canas*, 424 U.S. at 355. But, "standing alone, the fact that aliens are the subject of a state statute does not render it a regulation of immigration . . . ." *Id.* The Proposition 100 laws neither determine who should be admitted to the United States nor prescribe conditions under which legal entrants may remain. Rather, those who are subject to detention under the Proposition 100 laws are being detained because of the crime they are accused of committing. Arizona state officials are not directly facilitating immigration removals and their immigration status decisions for the purposes of Proposition 100 are not binding in subsequent proceedings within the federal immigration system.

Plaintiffs-Appellants argue that Proposition 100 is nevertheless preempted because it creates a state-law category of persons who have "entered or remained in the United States illegally." Ariz. Const. art. II, § 22(A)(4). Arizona's implementing statute directs courts making Proposition 100 status determinations to consider, among other things, "[a]ny . . . relevant information that is obtained by the court or that is presented to the court by a party or any other person." Ariz. Rev. Stat. Ann. § 13-3961(A)(5)(a)(vi). Plaintiffs-Appellants claim that Proposition 100 status determinations amount to state-law determinations of immigration status without regard to federal immigration law and federal status determinations. Undeniably, "[t]he States enjoy no power with respect to the classification of aliens." *Plyler v. Doe*, 457 U.S. 202, 225 (1982) (citing *Hines v. Davidowitz*, 312 U.S. 52 (1941)). On this basis, Plaintiffs-Appellants point to several federal district court cases in

which state law immigration classifications were deemed preempted.  Each of these cases, however, is distinguishable.

In *Equal Access Education v. Merten*, 305 F. Supp. 2d 585, 603 (E.D. Va. 2004), the court held that a Virginia higher education admissions policy denying admission to illegal aliens would violate the Supremacy Clause only if the institutions implementing the policy were relying on state rather than federal immigration standards.  In *League of United Latin American Citizens v. Wilson*, 908 F. Supp. 755, 772 (C.D. Cal. 1995), the court deemed parts of a California voter-approved initiative preempted, reasoning that portions of the initiative were an impermissible regulation of immigration because "the [immigration status] classification . . . *is not in any way tied to federal standards*."  Likewise, in *Hispanic Interest Coalition of Alabama v. Bentley*, No. 5:11-cv-02484-SLB, 2011 WL 5516953, at \*23 (N.D. Ala. Sept. 28, 2011), *vacated as moot in part by* 691 F.3d 1236, 1242 (11th Cir. 2012), the court preliminarily enjoined some provisions of Alabama's House Bill 56 because their implementation would impermissibly create state classifications of aliens.

Although it is true that Arizona's implementing statute directs courts making Proposition 100 status determinations to consider "any . . . relevant information," it also commands consideration of "[w]hether a hold has been placed on the arrested person by the United States immigration or customs enforcement."  Ariz. Rev. Stat. Ann. § 13-3961(A)(5)(a)(i). Thus, contrary to Plaintiffs-Appellants' assertions, Arizona state courts are not authorized to make state-law determinations of immigration status without regard to federal status determinations.  Unlike in *Wilson*, the state-law determination here is tied to federal standards.  Furthermore,

evidence in the record shows that Maricopa County Sheriff's Office Section 287(g)-certified deputies cross-reference ICE databases when making Proposition 100 recommendations at initial appearances.  Finally, the screening questionnaire administered by the deputies to determine whether an arrestee is subject to Proposition 100 includes questions such as, "Do you have any applications or petitions pending with US CIS?"[14] and, "Have you been removed, deported, excluded or VR'd[15] before from the U.S.?"

This evidence demonstrates that Arizona state officials are not attempting to create a new state-law classification for those who have "entered or remained in the United States illegally," but rather are seeking to determine whether arrestees are in violation of federal immigration law.  As the Supreme Court recently held in *Arizona v. United States*, 132 S. Ct. 2492, 2508 (2012), Congress has "encouraged the sharing of information about possible immigration violations," and federal law permits "a policy requiring state

---

[14] United States Citizenship and Immigration Services processes applications to adjust the immigration status of aliens present in the United States, including adjustments through the issuance of Green Cards granting Lawful Permanent Resident Status.  *See generally U.S. Immigration Online*, U.S. CITIZENSHIP AND IMMIGRATION SERVICES, http://www.immigrationdirect.com/ (last visited June 10, 2013).

[15] "VR" here refers to Voluntary Departure (or Removal), a benefit extended to illegal aliens who are permitted to waive deportation proceedings by agreeing to immediately leave the United States upon apprehension by Immigration and Customs Enforcement officers such as the United States Border Patrol.  *See Glossary*, U.S. CITIZENSHIP AND IMMIGRATION SERVICES, http://www.uscis.gov/portal/site/uscis/menuitem.5af9bb95919f35e66f614176543f6d1a/?vgnextoid=9e258fa29935f010VgnVCM1000000ecd190aRCRD&vgnextchannel=b328194d3e88d010VgnVCM10000048f3d6a1RCRD (last visited June 10, 2013).

officials to contact ICE as a routine matter." Because Proposition 100 neither regulates immigration nor impermissibly creates state-law immigration classifications, we hold that Proposition 100 is not constitutionally preempted.

**B**

Plaintiffs-Appellants next argue that Proposition 100 intrudes on a field exclusively occupied by federal law because it imposes mandatory detention under state law of persons suspected of committing federal immigration law offenses. In support of this claim, Plaintiffs-Appellants cite to myriad federal Immigration and Naturalization Act provisions related to federal immigration detention and removal. *De Canas v. Bica*, 424 U.S. 354 (1976), provides the framework for the resolution of this argument. *De Canas* teaches, "we will not presume that Congress, in enacting the INA, intended to oust state authority to regulate . . . in a manner consistent with pertinent federal laws." 424 U.S. at 357. Instead, "[o]nly a demonstration that complete ouster of state power including state power to promulgate laws not in conflict with federal laws was the clear and manifest purpose of Congress would justify that conclusion." *Id.* (internal citations and quotation marks omitted).

The INA provisions cited by Plaintiffs-Appellants regulate detention for immigration violations, while Proposition 100 regulates pretrial detention for those arrested for committing Class 1 through 4 state felonies and aggravated driving-under-the-influence offenses. Plaintiffs-Appellants have not shown that Congress intended to effect a "complete ouster of state power" with respect to bail

determinations for state-law crimes.  Accordingly, we hold that Proposition 100 is not field preempted.

## C

Finally, Plaintiffs-Appellants argue that even if Proposition 100 is not field preempted, it nevertheless "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *De Canas*, 424 U.S. at 363 (internal citations and quotation marks omitted). Following the Supreme Court's directive that "[i]mplied preemption analysis does not justify a freewheeling judicial inquiry into whether a state statute is in tension with federal objectives" and that "a high threshold must be met if a state law is to be preempted for conflicting with the purposes of a federal Act," *Chamber of Commerce of U.S. v. Whiting*, 131 S. Ct. 1968, 1985 (2011), we hold that Proposition 100 does not conflict with federal law.

Plaintiffs-Appellants claim that the Proposition 100 laws impose incarceration for unlawful presence in the United States in opposition to Congress's judgment as to when aliens should or should not be detained for immigration violations. But Proposition 100 regulates only the bail determinations for state-law crimes and does not impose incarceration for federal immigration law violations.  While it is true that in certain instances Proposition 100 may mandate the pretrial detention of a person who would be deemed bondable by a federal immigration judge, such detention is not meant to punish an alleged immigration violation but rather to ensure presence in Arizona to stand trial for alleged state-law crimes.

Plaintiffs-Appellants cite to *Arizona v. United States* as support for their argument that state officers cannot deprive

noncitizens of their liberty based upon purported immigration violations without running afoul of conflict preemption principles. Admittedly, the *Arizona* court wrote that "it would disrupt the federal framework to put state officers in the position of holding aliens in custody for possible unlawful presence without federal direction and supervision." 132 S. Ct. at 2509. But Proposition 100 does not permit state officials to hold aliens *because* of their unlawful presence. Rather, it permits them to hold those arrested based on probable cause for committing serious state-law felonies to ensure they will remain here to answer the charges. Plaintiffs-Appellants' declaration that "[b]ut for their purported immigration violations, individuals subjected to Proposition 100 would be eligible for bail like any other defendant under Arizona law," Corrected Brief of Appellants at 62, No. 11-16487 (Nov. 2, 2011), could just as easily be expressed as "but for their commission of state-law felonies, those unlawfully present in the United States would not be detained under Proposition 100." Proposition 100 is not conflict preempted.

## VII

The Arizona Legislature and Arizona voters passed the Proposition 100 laws to further the state's legitimate and compelling interest in seeing that those accused of serious state-law crimes are brought to trial. At oral argument, counsel for both sides urged us to rule on the constitutional issues presented by passage and implementation of Arizona's constitutional amendment based on the record presented to the district court. After reviewing the record, we are satisfied that Plaintiffs-Appellants have not succeeded in raising triable issues of fact as to whether Proposition 100 and its implementing procedures violate the substantive and

procedural due process guarantees of the United States Constitution's Fourteenth Amendment, the Excessive Bail Clause of the Eighth Amendment, and the Sixth Amendment right to counsel, nor whether the Proposition 100 laws are preempted by federal immigration law.

Accordingly, the judgment of the district court is **AFFIRMED**.

---

FISHER, Circuit Judge, dissenting:

Due process guarantees that individuals arrested for a crime are entitled to bail pending determination of their guilt or innocence, with some limited exceptions. Arizona, however, has decided to deny pretrial bail to all persons arrested for a range of felony crimes who are in the United States without authorization, theorizing they are likely to flee the country solely because of their immigration status. Without any evidence that unauthorized immigrants released on bail have been or are less likely to appear for trial compared to arrestees who are lawful residents, the majority accepts Arizona's unsupported assertion that *all* unauthorized immigrants necessarily pose an unmanageable flight risk, such that a blanket denial of bail is not an "excessive" tool to combat flight risk. As revealed by Proposition 100's legislative history and scope, however, Arizona is plainly using the denial of bail as a method to punish "illegal" immigrants, rather than simply as a tool to help manage arrestees' flight risk. "It is axiomatic that 'due process requires that a pretrial detainee not be punished.'" *Schall v. Martin*, 467 U.S. 253, 269 (1984) (alteration omitted) (quoting *Bell v. Wolfish*, 441 U.S. 520, 535 n.16 (1979)).

Because this bail-denial scheme contravenes the Constitution's fundamental prohibition on punishment before determination of guilt in a criminal trial, I dissent.

## I.  SUBSTANTIVE DUE PROCESS

Proposition 100 categorically denies bail and thus requires pretrial detention for every undocumented immigrant charged with any of a broad range of felonies, regardless of the seriousness of the offense or the individual circumstances of the defendant, including the defendant's strong ties to and deep roots in the community.  The state maintains – and the majority holds – that this unique, sweeping pretrial detention statute, directed solely at undocumented immigrants, comports with substantive due process because it has a permissible purpose and is reasonably related to the state's interest in preventing pretrial flight.  I respectfully disagree.

Under *United States v. Salerno*, 481 U.S. 739 (1987), a restriction on bail violates substantive due process if it either (1) has a punitive purpose or (2) imposes an excessive restriction on liberty in relation to a permissible regulatory purpose.

> To determine whether a restriction on liberty constitutes impermissible punishment or permissible regulation, we first look to legislative intent.  Unless [the legislature] expressly intended to impose punitive restrictions, the punitive/regulatory distinction turns on whether an alternative purpose to which the restriction may rationally be connected is assignable for it, and whether it

> appears excessive in relation to the alternative
> purpose assigned to it.

*Id.* at 747 (citation, alterations and internal quotation marks omitted).  Although preventing flight risk is a permissible regulatory purpose, *see id.* at 749; *Bell*, 441 U.S. at 536, Arizona's indiscriminate pretrial detention law is unconstitutionally punitive under both prongs of *Salerno*.  I address each in turn.

### A.  Legislative Purpose

First, the record plainly shows that lawmakers designed Proposition 100 – at least in large part – to punish undocumented immigrants for being in the United States unlawfully:

• State Representative Russell Pearce, the bill's sponsor, stated that Proposition 100

> just simply bridges the gap, a loophole in the
> law that would allow people who are not in
> this country []legally who have no business to
> be released if they commit any crime, they
> have no business being released if they
> commit no crime, no additional crime
> [be]cause they're already in this country
> illegally.

*Senate Judiciary Committee Meeting on H.B. 2389*, Mar. 28, 2005, 47th Leg., 1st Regular Sess. (Ariz. 2005).  Notably, and contrary to Pearce's suggestion, being "in this country illegally" is not a crime.  *See Arizona v. United States*, 132 S. Ct. 2492, 2505 (2011).

• Rep. Pearce promoted the bill on the ground that "all illegal aliens in this country ought to be detained, debriefed and deported." *Id.* He reiterated: "If you're in this country illegally you ought to be detained [and] deported[.] [E]nd of story," and defended the bill as a "reasonable approach" to border security.[1] *Id.*

• State Representative Ray Barnes expressly promoted the bill on the (again, erroneous) assumption that "the mere fact that they're here undocumented [means] that the crime has already been committed." *House Judiciary Committee Meeting on H.B. 2389*, Jan. 27, 2005, 47th Leg., 1st Regular Sess. (Ariz. 2005).

---

[1] To Rep. Pearce, Proposition 100 would punish undocumented immigrants for two wrongs: being present in the United States unlawfully and committing (more accurately, being arrested for) a felony. *See Senate Judiciary Committee Meeting on H.B. 2389*, Mar. 28, 2005, 47th Leg., 1st Regular Sess. (Ariz. 2005) ("[B]ad enough you're illegal but you commit a serious crime you ought not to be bondable."); *id.* ("[T]his bill targets very simply those who commit serious, serious [criminal] acts in our community. A very responsible bill to protect our citizens from those who would enter our country illegally and commit serious crimes against us."). Both of Pearce's reasons are impermissibly punitive. Bail cannot be denied to punish immigrants for being in the country illegally. Nor can it be denied to punish them for charged, but unproven, crimes. *See Bell*, 441 U.S. at 535 ("[U]nder the Due Process Clause, a [defendant] may not be punished prior to an adjudication of guilt in accordance with due process of law."); *Salerno*, 481 U.S. at 746 (citing *Bell* for the proposition that pretrial detention violates substantive due process when it constitutes "impermissible punishment before trial"). As the Supreme Court has recognized, "Arizona may have understandable frustrations with the problems caused by illegal immigration," *Arizona v. United States*, 132 S. Ct. at 2510, but punishing undocumented immigrants by denying them bail is not a permissible expression of that frustration.

• State Senator Jack Harper said, "what part of illegal don't we understand?  Illegal aliens shouldn't be able to get bond for anything." *Senate Judiciary Committee Meeting on H.B. 2389*, Mar. 28, 2005, 47th Leg., 1st Regular Sess. (Ariz. 2005).

• In a hearing on a bill to implement Proposition 100 after its passage, State Representative John Kavanagh said: "I'm amazed that we provide bail to anybody who's arrested for a crime that's an illegal alien. . . .  I therefore support this bill as a first step to what we should be really doing and that's deporting anybody here illegally." *House Floor Meeting on S.B. 1265*, June 13, 2007, 48th Leg., 1st Regular Sess. (Ariz. 2007).

The majority correctly observes that some statements in the legislative record refer to flight risk rather than punishment.  Fairly viewed, however, the legislative record *as a whole* clearly shows that legislators were motivated *at least in large part* by an overriding desire to punish undocumented immigrants for being in the country unlawfully – i.e., that lawmakers "intended to impose punitive restrictions" on undocumented immigrants. *Salerno*,

481 U.S. at 747.[2]  The plaintiffs therefore have established a due process violation under *Salerno*'s first prong.[3]

## B. Excessiveness

Even if Proposition 100 were enacted for the regulatory purpose of managing flight risk, it would still violate substantive due process under *Salerno*'s second prong, because it restricts substantially more liberty than necessary to achieve the state's legitimate interest.  *See Salerno*, 481 U.S. at 747.  The state's premise that immigration status and flight risk are closely linked is unsubstantiated. Furthermore, even if there is some link, the state's blanket

---

[2] *Salerno* does not require the plaintiffs to prove that punishment was the sole or even the predominant purpose of the legislation.  Even if that were a requirement, however, the plaintiffs have satisfied it here. *Cf. McCreary Cnty. v. ACLU of Ky.*, 545 U.S. 844, 860 (2005) ("When the government acts with the ostensible and predominant purpose of advancing religion, it violates that central Establishment Clause value of official religious neutrality, there being no neutrality when the government's ostensible object is to take sides."); *City of Indianapolis v. Edmond*, 531 U.S. 32, 46–47 (2000) (holding that a checkpoint program with an impermissible primary purpose violated the Fourth Amendment even though the program served lawful secondary purposes); *Bush v. Vera*, 517 U.S. 952, 959 (1996) (plurality opinion) (concluding that in a "mixed motive" case challenging race-conscious redistricting on equal protection grounds, strict scrutiny would apply only if race was the "predominant factor" in drawing the districts).

[3] This, of course, is not the first time Arizona's concerns about illegal immigration have resulted in impermissible legislation. *See, e.g.*, *Arizona v. United States*, 132 S. Ct. at 2503, 2505, 2507 (striking down alien-registration and criminal provisions targeting undocumented immigrants as preempted by federal law); *Valle Del Sol, Inc. v. Whiting*, 709 F.3d 808 (9th Cir. 2013) (enjoining day laborer provisions targeting undocumented immigrants as a violation of the First Amendment).

denial of bail is an excessive and overbroad tool to prevent flight risk.

To conduct a meaningful excessiveness analysis, we must compare the magnitude of the societal problem being addressed against the severity of the chosen remedy.  The societal ill Proposition 100 targets is not flight risk generally, but rather the *increased* flight risk supposedly posed by undocumented immigrants, the only individuals the proposition covers.[4]  The defendants have failed to establish that this societal problem exists, much less demonstrate its magnitude.

Unlike the defendants in *Salerno* and *Demore v. Kim*, 538 U.S. 510 (2003) –  who presented data to back up their claims that the bail schemes under review addressed "a particularly acute problem," *Salerno*, 481 U.S. at 750; *see also Demore*, 538 U.S. at 518–20 – the defendants here have failed to present any findings, studies, statistics or other evidence showing that undocumented immigrants actually posed a significantly greater flight risk than lawful residents before implementation of Proposition 100.[5]  Despite the lack

---

[4] Before Proposition 100 passed, Arizona had an extensive bail scheme designed to help ensure that arrestees appear for trial.  *See* Ariz. Const. art. II, § 22 (West Nov. 27, 2006 version); Ariz. Rev. Stat. § 13-3967(B). These procedures already required judges to consider the arrestee's immigration status when making bail determinations.  *See* Ariz. Rev. Stat. § 13-3967(B)(11)–(12).  The defendants have not shown that this set of regulations, addressing flight risk on a case-by-case basis, was inadequate to protect the state's legitimate interest in ensuring arrestees' appearance at trial.

[5] Neither *Demore*'s holding nor the statistics cited therein helps establish the constitutionality of pretrial detention in criminal cases.  *Demore* approved the brief detention of an alien pending *removal* proceedings

of any supporting data, Arizona, the district court and the majority have all *assumed* that undocumented immigrants pose a greater flight risk than other arrestees. When the chosen remedy is so draconian as to categorically deny bail to anyone who is *probably* an undocumented immigrant, the justification should be demonstrated factually, rather than supported by only unsubstantiated assumptions and anecdotes. If undocumented immigrants actually demonstrated a substantially greater flight risk before Proposition 100, defendants had five years to gather and present data to back up such a claim. They have presented nothing of the sort to support their assertion that Proposition 100 addresses "a pressing societal problem." *Salerno*, 481 U.S. at 747.

On the other side of the scale from the state's interest in ensuring appearance at trial is a profound infringement on

---

when the alien had *already been convicted* of an enumerated crime. *See Demore*, 538 U.S. at 513. The periods of detention at issue in *Demore* were short – an average of 47 days if the alien did not appeal the decision of the Immigration Judge, or four months if the alien appealed. *See id*. at 529. The time between an arrest and a criminal trial can last far longer. Before passing the law at issue in *Demore*, Congress reviewed several studies concerning recidivism rates of criminal aliens and their rates of failure to appear for subsequent removal hearings. *See id*. at 518–20. These studies, however related to *convicted* immigrants appearing for their *removal* proceedings; they do not provide support for Proposition 100, which ostensibly rests on *arrested* immigrants appearing for their *criminal* proceedings. Congress also had specific reason to conclude that, under the circumstances at issue in *Demore*, case-by-case determinations of suitability for release would be ineffectual. *See id*. at 528. Importantly, the Supreme Court approved the brief detention of criminal aliens in *Demore* in recognition of Congress' "broad power over naturalization and immigration," which allows Congress to "regularly make[] rules that would be unacceptable if applied to citizens." *Id*. at 521. The states do not have plenary power over naturalization and immigration.

liberty interests: automatic detention in jail without the possibility of bail, simply based on an arrestee's presumed status as an undocumented immigrant.  Such a denial of bail implicates "a basic and significant liberty interest in not being confined pending trial." *United States v. Motamedi*, 767 F.2d 1403, 1414 (9th Cir. 1985) (Boochever, J., concurring in part and dissenting in part).  "The consequences of prolonged [pretrial] detention may be more serious than the interference occasioned by arrest.  Pretrial confinement may imperil the suspect's job, interrupt his source of income, and impair his family relationships." *Gerstein v. Pugh*, 420 U.S. 103, 114 (1975).  "Pretrial detention may hamper the preparation of a defense by limiting the defendant's access to his attorney and to potential witnesses for the defense." *Motamedi*, 767 F.2d at 1414  (Boochever, J., concurring in part and dissenting in part) (citing *Stack v. Boyle*, 342 U.S. 1, 4 (1951)).

Even if the defendants could show that undocumented immigrants pose a greater flight risk on average than lawful residents, Proposition 100 is fatally flawed because it uses the disfavored mechanism of an irrebuttable presumption, rather than an individualized hearing, to determine whether an arrestee is an unmanageable flight risk.  In *Salerno*, the regulatory scheme was limited to arrestees who actually posed a danger to the community.  First, it was limited to "individuals who have been arrested for a specific category of extremely serious offenses" – who Congress found were "far more likely to be responsible for dangerous acts in the community after arrest." *Salerno*, 481 U.S. at 750.  Second, even for arrestees falling within that specific category, the scheme provided case-by-case determinations of the need for pretrial detention.  Each arrestee was entitled to a "full-blown adversary hearing," at which the government was required to prove by "clear and convincing evidence" that the individual

presented "a demonstrable danger to the community" and that "no conditions of release c[ould] reasonably assure the safety of the community." *Id.* It was only "[u]nder these narrow circumstances" that the Court held that society's interest was sufficient to outweigh the "individual's strong interest in [pretrial] liberty." *Id*.

In contrast, Proposition 100 is not narrowly focused on those arrestees who actually pose the greatest flight risk. Plainly, *some* undocumented immigrants do not pose unmanageable flight risks. The record includes examples of undocumented immigrants who were arrested before Proposition 100, granted bail and appeared at their court dates and trials. Yet even these individuals were needlessly remanded into state custody following Proposition 100's passage.[6] Proposition 100 eliminates the opportunity for comparable arrestees to show that, notwithstanding their immigration status, they do not pose a flight risk.[7]

---

[6] The majority finds it odd that I am "comfortable" with this anecdotal evidence but not comfortable with Arizona's anecdotal evidence of undocumented immigrants evading justice by leaving the United States. Maj. Op. at 16–17 n.10. But I do not suggest that anecdotal evidence cannot inform legislation; rather, I believe anecdotal evidence, *standing alone*, cannot support an irrebuttable presumption affecting substantial rights. I mention the anecdotal evidence of some undocumented immigrants posting bail and continuing to appear for their court dates and trial not to suggest a per se rule that undocumented immigrants should receive bail. On the contrary, I cite this evidence to illustrate the need for an individualized inquiry regarding the flight risks posed by particular undocumented immigrants, whose behavior in the face of criminal charges is not as homogeneous as Arizona assumes it to be.

[7] Unlike the Bail Reform Act provision *Salerno* upheld, which applies only to a narrow category of extremely serious offenses, *see Salerno*, 481 U.S. at 750-51, Proposition 100 applies to anyone arrested for a Class

The Arizona legislature surmised that undocumented immigrants pose a greater flight risk than lawful residents because they supposedly lack strong ties to the community and have a "home" in another country to which they can flee, but this ignores those undocumented immigrants who have strong ties to their community and no home abroad. Many undocumented immigrants, for example, have "children born in the United States" and "long ties to the community." *Arizona v. United States*, 132 S. Ct. at 2499.[8]  Moreover, although the defendants consistently refer to undocumented immigrant arrestees as "flight risks," the pertinent inquiry is whether the arrestee is an *unmanageable* flight risk.  There are a variety of methods to manage flight risk, such as bond requirements, monitoring and reporting requirements.  *See, e.g.*, Ariz. Rev. Stat. § 13-3967(D).  Proposition 100 ignores

---

1, 2, 3 or 4 felony or aggravated driving under the influence.  This broad list of crimes includes nonviolent offenses such as unlawful copying or sale of sound recordings, *see* Ariz. Rev. Stat. § 13-3705, altering a lottery ticket with intent to defraud, *see id*. § 5-566, and tampering with a computer with the intent to defraud, *see id*, § 13-2316.  Non-custodial sentences are possible for several of these crimes.

[8] A recent study of undocumented immigrants in California, conducted by the Center for the Study of Immigrant Integration at the University of Southern California, found that, "contrary to popular misconceptions," undocumented immigrants "are a fairly settled population." Undocumented Californians, Immigration Reform, and Our Future Together (May 2013), available at http://csii.usc.edu/documents/ whats_at_stake_for_the_state.pdf.  The researchers found that 50 percent of undocumented immigrants have been in the United States for more than 10 years; 17 percent of those who are household heads are homeowners; and millions more have U.S.-born children.  See *id*. at 9, 15.  These data about Arizona's neighboring state cast grave doubt on Arizona's irrebuttable presumption that undocumented immigrants lack strong ties to the community.

these tools for managing flight risk, instead mandating incarceration in every case.

The Constitution disfavors irrebuttable presumptions like Proposition 100's categorical denial of bail. *See Cleveland Bd. of Educ. v. LaFleur*, 414 U.S. 632, 645–46 (1974); *Vlandis v. Kline*, 412 U.S. 441, 446 (1973). In *Stanley v. Illinois*, 405 U.S. 645 (1972), an unwed father's children were removed by the state after the children's mother died, based on the state's use of a conclusive presumption that unwed fathers were unsuitable, neglectful parents. *See id.* at 646–47. The Court acknowledged that "[i]t may be, as the State insists, that most unmarried fathers are unsuitable and neglectful parents," but it noted that even if true on average, there were exceptions: "all unmarried fathers are not in this category; some are wholly suited to have custody of their children." *Id*. at 654. So too here. Even assuming undocumented immigrants pose a greater flight risk on average (not established, as discussed above), some by definition do not. Proposition 100 therefore results in far more arrestees being denied bail than necessary, making it plainly excessive in relation to its stated purpose.

Contrary to the majority's assertion, categorical denials of bail for non-capital crimes are rare.[9] The majority identifies

---

[9] Assuming categorical denials of bail for capital offenses are constitutional (although no federal appellate court has yet so decided), such a result would likely be based on the Anglo-American legal tradition, which has a unique history of denying bail in capital cases. *See Hunt v. Roth*, 648 F.2d 1148, 1159–60 (8th Cir. 1981) (discussing the historical basis for the denial of bail for capital crimes), *vacated as moot sub nom. Murphy v. Hunt*, 455 U.S. 478 (1982). Similar historical underpinnings do not support categorical denial of bail for other crimes or, as here, on the basis of immigration status.

only eight states that categorically deny bail for crimes punishable by life in prison. Maj. Op. at 14. Whether even these laws are constitutional is hardly a settled question, having never been declared such by the Supreme Court or a federal appellate court. But even these eight states do not go as far as Arizona. The majority identifies only one other state that categorically denies bail to undocumented immigrant arrestees.[10]

Even before Proposition 100, Arizona went further than most states in restricting bail, categorically denying bail not only to those arrested for capital crimes or crimes subject to life in prison, but also to those arrested for certain sexual crimes not subject to life imprisonment. Maj. Op. at 16 (citing Ariz. Const. art. II, § 22). The majority takes comfort in Arizona's expansive use of categorical denial of bail, saying "Proposition 100 is nothing more than an extension of Arizona's existing pretrial detention scheme." Maj. Op. at 16. The more appropriate reaction would be that Proposition 100, which is a major expansion of categorical bail denial, reflects a serious devaluation of the presumption of innocence and the constitutional principle that arrestees may not be punished before judgment of guilt.

In sum, Proposition 100 is excessive in relation to its stated legitimate purpose for two independent reasons. First,

---

[10] Of course, even if Arizona's bail scheme were better represented among the states, a challenged law does not become constitutional simply because it has company. *See, e.g.*, *Lawrence v. Texas*, 539 U.S. 558, 570 (2003) (striking down a Texas law criminalizing homosexual intercourse, even though similar laws existed in nine states); *Loving v. Virginia*, 388 U.S. 1, 6 (1967) (striking down a Virginia statute prohibiting interracial marriages, although Virginia was one of 16 states to have such a prohibition).

it purports to deal with a societal ill that has not been shown to exist at all.  Second, even if we assume that undocumented immigrants pose a greater flight risk on average than lawful residents, Proposition 100 is fatally flawed because it uses the disfavored mechanism of an irrebuttable presumption, rather than an individualized hearing, to determine whether an arrestee is an unmanageable flight risk.  This mechanism necessarily results in the deprivation of far more liberty than necessary to ensure appearance at trial, because even undocumented immigrants who do *not* pose a flight risk or who pose a *manageable* one will be categorically denied bail based on their status alone.  Proposition 100 fails *Salerno*'s second prong and facially violates substantive due process.

## II.  REMAINING CLAIMS

Because I conclude that Proposition 100 on its face violates substantive due process, I do not address the plaintiffs' procedural due process, Eighth Amendment, Supremacy Clause and as-applied claims, though some of them appear meritorious.

## III.  CONCLUSION

"Procedure by presumption is always cheaper and easier than individualized determination. But when, as here, the procedure forecloses the determinative issues . . . , when it explicitly disdains present realities in deference to past formalities, it needlessly risks running roughshod over the important interests" of the person whose rights are at stake. *Stanley*, 405 U.S. at 656–57.  By employing a no-bail scheme that conclusively equates unlawful immigration status with unmanageable flight risk, Arizona is needlessly locking up undocumented immigrant arrestees awaiting trial under the

guise of ensuring their appearance at trial, even though many of these individuals would voluntarily appear for trial if released on bail and could demonstrate such willingness if provided the opportunity, or other methods exist to assure their appearances. The excessiveness and overbreadth of this scheme, particularly in light of its legislative history, reveal that the real purpose of Proposition 100 was to use the categorical denial of bail to punish arrestees – for their assumed undocumented status and for their suspected but unproven crimes.

I would hold that Proposition 100 violates substantive due process because it fails both prongs of the *Salerno* test, either one of which is sufficient to find Arizona's categorical denial of bail here unconstitutional. I therefore respectfully dissent.